# Guzzi *v.* Delaware & Hudson Company, Appellant, (No. 1).

*Ejectment—Prior ejectments—Evidence—Parties—Privy in title —Equity—Jurisdiction.*

In a suit in equity where the real dispute is title to land it is reversible error for the court to admit in evidence the records of two prior ejectments concerning the same land in which the defendant corporation was not a party, and where a deed offered in

evidence by the plaintiff showed that the defendant did not hold anything as a privy through or under the successful party in the prior ejectments, but was in fact the grantor of the land in dispute, to such unsuccessful party. Such a deed in itself has no evidential value where it appears that it merely purported to convey "the surface or right of soil" reserving the mineral without surface support, and the plaintiff's claim is for damages for failure to give such support.

A privy to a judgment or decree is one whose succession to the rights of property thereby affected occurs after the institution of the suit or from a party thereto.

Equity has no jurisdiction over a claim for damages for failure to afford surface support, where the suit involved a dispute as to the title to the coal; but if the defendant raises no question as to the jurisdiction and submits to the trial on the merits, the court will not thereafter dismiss the bill for lack of jurisdiction.

Argued March 2, 1915. Appeal, No. 28, March T., 1915, by defendant, from decree of C. P. Lackawanna Co., March T., 1913, No. 5, dismissing bill in equity in case of Teresa Guzzi v. The Delaware & Hudson Company. Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ. Reversed.

Bill in equity for an injunction and for an accounting. Before EDWARDS, P. J.

The court found the facts to be as follows:

1. Plaintiff is the owner of the surface of a lot of land situate on Hospital street in the City of Carbondale. The size of the lot is about 35 feet by 95 feet, and on it there are two buildings, one built of concrete mostly, and used for a store and dwelling; and, on the rear of the lot a frame building, occupied by tenants. These buildings were constructed about four years ago.

2. The plaintiff's title to her land is by deed from Thomas P. Duffy, who obtained title to a larger tract (including plaintiff's lot) from the heirs of Mary Duffy. The title of Mary Duffy was founded on adverse possession, established in our court by two verdicts in eject-

ment.  The records of the ejectment cases were admitted in evidence, and they show that Mary V. Duffy, the other contestant in the litigation, depended and defended on a paper title, to wit, a deed from the Delaware and Hudson Canal Company to her, in 1893, of the surface of the said tract of land; and the title claimed by Mary V. Duffy under said deed is the title that was defeated by the verdicts in ejectment.

3. The defendant, in the matter of coal and mining rights, is the successor to the Delaware and Hudson Canal Company.  The coal company, therefore, is the owner of the coal underneath the surface of large acres of land, including, inter alia, the Duffy tract.  While no particular effort was made during the hearing of the case, to prove the exact extent and nature of the defendant's mining rights, it is conceded by both sides that the defendant and its predecessor, for more than half a century, have been the owners of the coal, with the right to mine the same.  Each of the parties submit the same request as to the ownership of the coal.

4. The coal veins underlying the plaintiff's land in the Duffy tract, and in the lands contiguous thereto, are three in number, and are designated as the "Top," "Middle" and "Bottom" veins.  The top vein is about 100 feet below the surface, and is about six feet, nine inches, in thickness.  With a foot and a half of rock intervening comes the middle vein, and with about the same thickness of rock again intervening comes the bottom vein. These two latter veins are each about five and one-half feet in thickness.  It will be noticed that the three veins are very close to each other.  From the bottom of the top vein to the bottom of the lowest or third vein, the space is about thirteen feet.

5. The canal company began mining the top vein about the year 1860.  The mining was done in the manner customary at that period.  Pillars were left to support the surface.  The amount of coal left in the pillars

is variously estimated at from one-fourth to one-third.
The exact quantity of coal left in the pillars cannot be
accurately determined; but this fact is not of much im-
portance now. The company ceased mining the top-
vein, in the neighborhood of and under the Duffy tract,
in 1863, and since then there has been a general caving
in of the vein under the said tract, and beyond it for a
distance of five hundred feet or more. It is impossible
to ascertain the conditions in the top vein under plain-
tiff's lot, or under the Duffy tract, or under a larger
surrounding area, because these places or workings are
now inaccessible and have been so for many years. It
may be that the pillars left in the vein were insufficient
for surface support; or, it may be that they were suf-
ficient at first but, after many years, became weakened
and deteriorated, from one cause or another, and that
they gradually crumbled away. Speculation as to these
matters answers no useful purpose. The one important
fact in this connection, as established by the evidence, is
that there was no subsidence of the surface of plaintiff's
lot, nor of any part of the surface of the Duffy tract,
until the defendant began mining operations in the
third or bottom vein.

6. Defendant began mining in the bottom vein, in the
neighborhood of Hospital street and under the Duffy
tract, in September, 1911, and ceased mining in the
same territory in October, 1912, the operation in that
particular locality covering a period of mining of about
one year. Near the end of said period there occurred a
"squeeze" in the bottom vein, and there was a caving in
of the roof within ten or twenty feet of plaintiff's land.
Exactly under plaintiff's lot there was, in part, a solid
pillar of coal constituting about fifty per cent. of the
coal, the other fifty per cent. having been mined out.
While there was no roof down on the floor of the cham-
ber or chambers under said lot, there was an apparent
disturbance of the roof, because it was broken in parts,
and, in mining parlance, was "hanging," and was being

held up by timbering. The evidence clearly shows that the conditions in the bottom vein under the Guzzi property, and in the immediate vicinity, were dangerous. It was for this reason that the defendant ceased mining in that locality in October, 1912.

7. In the said month of October a subsidence of the surface of plaintiff's property occurred, causing damage to the two buildings erected thereon. The disturbance to the land itself was slight. There were cracks or fissures on the street, in the sidewalk, on the surface, between the two buildings, and in the cellar of the front house. These fissures were about two inches in width. The substantial injury was that which affected the buildings, particularly the concrete building. After a consideration of the evidence and of all the conditions thereby disclosed, I find that the injury to the plaintiff's property was caused by the mining done by defendant in the bottom vein. Whether the mining in this vein was the sole cause of the damage is impossible to determine; but that it contributed in a very material way to produce the conditions complained of is a proposition that is fairly established.

The court found in favor of the plaintiff for $453. Both plaintiff and defendant appealed.

*Error assigned* by defendant was decree awarding damages to the plaintiff.

*W. J. Torrey,* of *Wellse & Torrey,* with him *John P. Kelly,* for appellant.

*Thomas P. Duffy,* with him *Joseph F. Gilroy,* for appellee.

OPINION BY HEAD, J., October 11, 1915:

The plaintiff filed this bill in equity against the defendant corporation praying: first for an injunction to restrain it from the further mining of coal under cer-

tain premises averred to belong to her without leaving sufficient support for the surface; second, that an account be taken of the damages already sustained from said mining and a decree be entered requiring the defendant to pay the same. In her bill she first averred that she was the owner in fee simple of a certain tract of land in the City of Carbondale, the boundaries of which are set forth. She then admitted the defendant company was the owner of the coal underlying the surface of the said lot and was engaged in mining therein; that by reason of the manner in which said mining was conducted, her surface land had broken and caved in with the result that the buildings thereon had been seriously damaged. The defendant,—raising no question as to the jurisdiction of the court to entertain the bill,—answered on the merits, denying that the plaintiff had any title whatsoever to the lot of ground in question; averring it was the owner of the coal and was but exercising its right of ownership in prosecuting its mining operations in the manner in which they had been conducted, &c. Issue was joined and the case proceeded to final hearing. The learned court below thereupon dissolved the preliminary injunction which had been first entered, but determined the plaintiff had suffered certain damages and filed a decree requiring the defendant to pay the amount thereof. From that decree comes this appeal by the defendant.

Clearly enough we have before us in substance an action of trespass. Unless the plaintiff has established that she was the owner of the locus in quo, her case has entirely failed. To support her averment of ownership, she offered in evidence two certain deeds showing that her alleged title came from one Mary Duffey who, in 1906, had undertaken to convey some interest in the premises in dispute to one Thomas P. Duffey who later conveyed to the plaintiff. What title then had Mary Duffey, the plaintiff's grantor? In the attempt to so answer this question as to fix title in her, the plaintiff

was permitted to offer in evidence, over the objection of the defendant, the records and judgments in two certain actions of ejectment theretofore tried in the Court of Common Pleas of Lackawanna County. In the first of these Mary Duffey was plaintiff and one Mary V. Duffey defendant. The plaintiff recovered and judgment was entered in her favor. In the second action Mary V. Duffey in turn was plaintiff and Mary Duffey the defendant. This action resulted in a verdict and judgment for the defendant. One other piece of evidence offered by the plaintiff in the present action was also admitted over the objection of the defendant. This was a deed in which the defendant company was grantor and Mary V. Duffey, grantee. It was made in 1893, and by it the defendant undertook to convey "the surface or right of soil in a certain lot in Carbondale,—which we understand to be the premises in dispute,—to the grantee therein named." This deed expressly reserved unto the grantor the complete and unrestricted right to mine all of its coal under the said lot without being required to provide surface support for the same. And the grantee therein, by the express terms of the conveyance, took what was granted "subject to any claim or claims by, from, under or through any person or persons now or lately in the occupancy thereof, &c., and without any right to recover from the grantor any costs that might be incurred in any attempt to dispossess such occupants."

It being clear, under the evidence offered and received, that the present defendant had not been a party to either of the actions referred to; that no notice had ever been given to it by any one of the pendency of such actions or their trial; on what theory could the judgments in which these actions resulted become evidence to establish the present plaintiff's averment of ownership as against the responsive answer of the defendant? The learned court below appears to have reached the conclusion that although the defendant was not a party, it

was privy to such actions, and therefore, under the general rule, became bound by the judgments entered therein. If the court was in error in this conclusion and should have rejected the records of these actions, then the plaintiff's case wholly failed for want of evidence to establish her ownership and her bill should have been dismissed.

The general rule that judgments are conclusive between parties, and privies as well, is so thoroughly grounded in reason and so uniformly supported by decision that it may now be considered an axiom. We have then left the important question in the present case, who, in the law, is considered privy to a judgment in an action to which he was not a party? In Words & Phrases, Vol. VI, page 5606, we find "The term 'privity' denotes mutual or successive relationship to the same right of property." (Many cases cited.) In the same volume, page 5608, it is said: "A privy to a judgment or decree is one whose succession to the rights of property thereby affected occurs after the institution of the suit or from a party thereto: Orthwein v. Thomas, 21 N. E. 430; 127 Ill. 554; 4 L. R. A. 434, &c......Personal representatives, heirs, devisees, legatees, assignees, voluntary grantees, judgment creditors or purchasers from them with notice, are included within the term 'privies' as that word is used in the statement of the rule that a judgment is binding on parties and privies." In an editor's note to the case of Miller v. Ditlinger, 81 Kan. 9, reported in 26 L. R. A. (N. S.) 595, reviewing a large number of cases from many jurisdictions, we have this summary: "As a general rule the landlord will not be bound by a judgment in ejectment against the tenant in an action to which the landlord was not a party, at least if he had no notice of the suit. The reason for the rule is that the landlord does not claim through or under his tenant and therefore is not in that sense his privy." Our own Supreme Court has followed this well nigh universal trend of decision in determining who was to

be considered privy to a judgment entered in an action to which he was no party and of which he had no notice. In Strayer v. Johnson, 110 Pa. 21, Mr. Justice STER-RETT says: "Privies are those whose relationship to the same right of property is mutual or successive. In other words, privity denotes mutual or successive relationship to the right of property, title or estate...... The essential privity was not in the parties to the actions which determined the location of the Nelson survey, but in the right of property involved therein; and all parties subsequently coming into the title, no matter how, and relying on a right of property derived from either of the warrants and surveys, are visited with notice of the adjudication to which those surveys were subjected between the parties who were then the owners."    •

But the plaintiff in the present case can derive no aid from the rule as it is thus everywhere stated and defined. Had the plaintiff been able to show that this defendant claimed or held anything through or under Mary V. Duffey, the unsuccessful party in the actions, then indeed the rule would have applied. But she must uphold that the exact converse of the rule as stated is also a part of the rule. In other words, that because her grantor was able to show a better title to something than one Mary V. Duffey had, she may bind, as a party to the judgments obtained, every ancestor in title of Mary V. Duffey. This, as we view it, is unsound in reason as well as in law. A flowing stream derives everything which makes it a flowing stream from the fountain whence it springs. Manifestly, if an attack be made on the fountain which results in its damage or destruction, the stream below along all of its course must be materially, if not vitally affected by such an attack. But clearly, the converse of the proposition cannot be maintained. The waters below the spring may be fouled, diverted, or otherwise affected, but this in nowise impairs or interferes with the steady flow from the fountain.

We can find no warrant in any case decided in our

own State, nor in the many to which we have referred
from other jurisdictions, for the conclusion that the de-
fendant in the present case could properly be adjudged
a privy to the judgments entered in the two actions of
Duffey v. Duffey. That being true, the plaintiff failed
to establish that she had any title to or ownership in the
land that would support any interference by her in the
mining operations of the defendant in the coal which had
been owned by it or its predecessor for a half a century.

Moreover it is difficult to perceive how, in the issue
being tried, the deed from the defendant to Mary V.
Duffey possessed any evidential value. As we have seen
it purported to convey only "the surface or right of soil"
to the locus in quo. Even if we assume that, as a result
of the two actions of ejectment, Mary Duffey had estab-
lished title in herself to this "surface or right of soil,"
how could that fact support the plaintiff's claim for
damages resulting from the exercise, by the defendant,
of the identical right it had expressly reserved unto
itself in the deed referred to.

Lest this case should be mistakenly regarded as a
precedent upholding the jurisdiction of a court of equity
under similar circumstances, we deem it proper to add
that the learned judge below clearly pointed out the
plaintiff had a complete and adequate remedy at law.
The case immediately and necessarily resolved itself into
the trial of a disputed title to land. But as the defend-
ant, at no time raised any question as to the jurisdiction
and submitted to a trial on the merits, the court proper-
ly declined to dismiss the bill on that ground.

The decree of the court below is reversed and the bill
is dismissed at the costs of the appellee.